A. Wesley Newby and Hilma L. Newby v. Commissioner.
Newby v. Commissioner
Docket No. 87795.
United States Tax Court
T.C. Memo 1961-283; 1961 Tax Ct. Memo LEXIS 69; 20 T.C.M. (CCH) 1491; T.C.M. (RIA) 61283; October 9, 1961
Walter J. Lynwood, Esq., 7369 W. North Ave., Riverforest, Ill., for the petitioners. Theodore W. Hirsh, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in the petitioners' income tax for the years 1953, 1954 and 1955 in the respective amounts of $4,423.60, $829.02 and $3,842.94. Certain issues have been conceded by the parties. The only issue remaining before us is whether certain periodic payments received by petitioners in the years 1954 and 1955 in the respective amounts of $1,986.71 and $17,053.44 qualify for capital gains treatment under section 1235 of the Internal Revenue Code of 1954. [1]
*70 Findings of Fact Some of the facts have been stipulated and they are herein incorporated by this reference. A. Wesley Newby and Hilma L. Newby, husband and wife, are residents of Elgin, Illinois. They filed their joint Federal income tax returns for the years 1953, 1954 and 1955 with the district director of internal revenue, Chicago, Illinois. A. Wesley Newby will hereinafter be called the petitioner. Petitioner is president and 50 percent stockholder of the Newby & Peron Advertising Agency, and he has been in the advertising business in the years here involved. Late in 1949 Harry A. Mart disclosed to petitioner an idea for a "turret-seal cap" (hereinafter called the turret spout) that could be used in dispensing lighter fluids. Prior to this the petitioner and Mart had engaged in a venture to develop a manual pressure pump to be applied to tins of lighter fluid and the two parties also had other business dealings. Petitioner was interested in the turret spout and he agreed orally to advance up to $10,000 to develop the new device, and to work together with Mart in the development of the device. Petitioner made the first advance, in the amount of $1,500, to Mart in April *71 1950 and then continued to make advances through 1952 to Mart and to suppliers and others for expenses, materials, tools and dies. Mart retained a custom moulding plastic firm to develop a pilot mould of the new device, and both Mart and Newby participated in discussions with the engineer in charge of this work. A successfully tested sample of the turret spout was produced by the firm in February 1953. On June 30, 1951 Mart filed an application for a patent on the turret spout, and on December 20, 1955 Patent No. 2,727,658 was issued to him for this device. Mart also filed applications for patents on improved versions of the turret spout, as follows: Application
Patent
Patent
Filed
Granted
Number
September 22, 1951
September 13, 1955
2,717,726
September 28, 1953
April 1, 1958
2,828,895 Mart also applied for a design patent for the design of the turret spout on October 12, 1951, and on April 15, 1952, Design Patent No. 166,478 was issued to him. The turret spout as described in the first two patents (Nos. 2,727,658 and 2,717,726) were faulty, and the final patent (No. 2,828,895) covered the version of the spout which corrected the earlier faults. Petitioner *72 paid or guaranteed payment of the attorney's fees in connection with the application and receipt of these patents. Early in 1952, prior to March 17, Mart formed the Turret Seal Corporation under the laws of the State of Illinois. Petitioner paid the legal fees and costs of incorporation but received no stock in the corporation at that time. Petitioner in 1958 became president of Turret Seal Corporation and first acquired stock in the corporation in that year. On March 17, 1952 Mart and the Turret Seal Corporation executed a contract which provided, in part, as follows: License Agreement THIS AGREEMENT made this 17th day of March, 1952, by and between HARRY A. MART of Chicago, Illinois, hereinafter referred to as LICENSOR, and TURRET SEAL CORPORATION, an Illinois Corporation, hereinafter referred to as LICENSEE. Witnesseth: WHEREAS, Licensor is the owner of certain inventions relating to automatic closures for bottles, cans or containers suitable for use among other things on cigarette and cigar lighter fuel containers, cleaning fluid containers and the like, hereinafter referred to as Turret Spouts and which are the subject matter of pending applications for United States *73 Letters Patent, and Patents identified as follows: A. Application Serial No. 234,550, filed June 30, 1951 for Combined Spout and Cock. B. Application Serial No. 247,826, filed September 22, 1951 for Combined Spout and Cock. C. U.S. Design Letters Pat. No. D-166-478, for Design for a Combined Spout and Cock; and WHEREAS, Licensee is desirous of securing an exclusive license to manufacture, use and sell turret spouts in accordance with the inventions aforesaid, and under said applications and any Letters Patent which may be granted pursuant thereto. NOW, THEREFORE, for and in consideration of payments hereinafter specified to be made by Licensee to Licensor, and of the mutual covenants hereinafter contained, the parties agreed, each with the other, as follows: 1. Licensor grants to Licensee the exclusive right and license to manufacture, use and sell turret spouts embodying one or more of the inventions aforesaid, and any improvements therein which may fall within the scope of any claim or claims granted pursuant to the Patent and applications aforesaid, throughout the United States, its territories and possessions. 2. (a) Licensee agrees to pay to Licensor a royalty of *74 $2.00 per thousand for all turret spouts manufactured, sold or used by Licensee subject to the provisions of subparagraph (d) of this paragraph, provided, however, that the minimum royalty payment for each year of this Agreement shall be not less than $12,000.00 and in default thereof the Licensor may, at his election, license others to make and sell the turret spouts or cancel this Agreement upon giving to Licensee thirty (30) days notice of his intention to do so, * * *. * * *
11. Licensee agrees to recognize and honor all assignments of interest in royalties payable to Licensor, which the Licensor may grant to any third parties. On September 15, 1952 the petitioner and Mart executed an agreement which provided, in part, as follows: WHEREAS, MART has invented a Combined Valve and Spout Unit (hereinafter referred to as Turret Spout) suitable for use as dispensing caps or tops on containers and has applied for U.S. Letters Patent thereon under certain applications and has been issued a patent identified as follows: a. Application Serial No. 234,550, filed June 30, 1951 for Combined Spout and Cock. b. Application Serial No. 247,826, filed September 22, 1951 for Combined *75 Spout and Cock. c. U.S. Design Letters Pat. No. D-166-478, for Design for a combined Spout and Cock. and MART is the owner of all right, title and interest in and to said inventions, applications and patent, subject to a license to TURRET SEAL CORPORATION; and WHEREAS, MART desires to obtain financing for the purpose of producing moulds and samples of the Turret Spout and to initiate a sales program; and WHEREAS, MART has entered into an Agreement with TURRET SEAL CORPORATION granting to said Corporation a license under said patent and patent applications and improvements in said Turret Spouts; and WHEREAS, said TURRET SEAL CORPORATION will engage in the manufacture and sale of Turret Spouts under said License Agreement; and WHEREAS, NEWBY because of his confidence in the excellence of the Turret Spout has furnished to MART certain financing for the purposes as set forth in the paragraphs above. NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, it is agreed: 1. MART hereby acknowledges the receipts of loans from NEWBY in the amount of Six Thousand Four Hundred Twenty-three Dollars ($6,423.00). 2. NEWBY agrees to pay to MART the sum of *76 $2,500.00. 3. MART agrees to repay to NEWBY all loans made by NEWBY to MART hereunder within one year of first shipment of Turret Spouts to any buyer or not later than December 31, 1954, which ever date is earlier, and in addition thereto, as inducement for making said loans, and in consideration of the payment to MART of the $2,500.00 as provided in Paragraph 2 above, MART does hereby agree to pay to NEWBY or cause to be paid to NEWBY Ninety cents ($.90) for each One Thousand (1,000) Turret Spouts manufactured (as long as this agreement shall be in force) by MART or manufactured by any one else as Licensee, transferee or in any other capacity under the above mentioned patents, applications, and any re-issues, continuations or divisions thereof or applications and patents on improvements in said Turret Spout. * * *
5. In the event that MART sells, assigns, exchanges or otherwise disposes of any part or all of the patent rights to which this Agreement relates, NEWBY shall have the option of receiving from MART Twenty-four per cent (24%) of the proceeds of any such sale, assignment, exchange or other disposition or, as an alternative option NEWBY shall have the right of retaining *77 (in relating to the purchaser, assignee or any other person receiving rights from any such sale, assignment, exchange or other disposition) the same position established between NEWBY and MART under this Agreement, and MART agrees that the instrument evidencing any such sale, assignment, exchange or other disposition shall recite the rights of NEWBY under this alternative option. It is the intent of this clause that NEWBY shall continue to receive Ninety cents ($.90) per thousand (1,000) Turret Spouts manufactured, from the purchaser, assignee or other person who shall assume MART'S obligation hereunder. MART shall give to NEWBY fifteen (15) days' notice by registered mail of any proposed bona fide sale, assignment, exchange or other disposition of the patent rights contemplated by this Agreement stating all terms under the proposed transaction during which time NEWBY shall select which of the above options he has elected to exercise. To secure the performance of MART'S obligations under this Agreement, MART hereby agrees to assign and transfer to NEWBY Twenty-four per cent (24%) undivided interest in and to the said invention and said patent rights including all improvements therein. *78 The said assignment to be evidenced by an instrument executed simultaneously herewith. MART shall not mortgage or otherwise encumber any of his rights under said patent, patent applications or patents granted pursuant thereto without the prior written consent of NEWBY. 6. It is hereby mutually agreed by the parties hereto that the payment to NEWBY of Ninety cents ($.90) for each 1,000 turret spouts manufactured as provided for in Paragraphs 3 and 5 above, shall in the case of manufacture for the Ronson Art Metal Works, Inc. a New Jersey Corporation be reduced to Seventy-one and one-quarter cents ($.71 1/4) for each 1,000 Turret Spouts. On April 9, 1953 and May 27, 1954 petitioner and Mart entered into agreements amending the September 15, 1952 agreement. The amendment of April 9, 1953 provided, in part, as follows: WHEREAS, MART now desires to re-purchase from NEWBY a portion of the rights to payment made under the said Agreement and NEWBY desires to sell to MART. NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, it is agreed: 1. MART agrees to pay to NEWBY the sum of Twenty-one Thousand Dollars ($21,000.00) * * *
2. NEWBY agrees that *79 the payments to him as called for under the Agreement of September 15th, 1952, shall be reduced to sixty-three and three-quarter cents (63 3/4 [cents]) per one thousand (1,000) Turret Spouts manufactured and in the case of manufacture for RONSON ART METAL WORKS, INC. the payment shall be reduced to forty-five cents (45 [cents]) per one thousand (1,000). 3. NEWBY agrees that the percentage to be received by him under the terms of the option and the percentage interest in the invention and patent rights be reduced from twenty-four percent (24%) to seventeen percent (17%). Similarly, under the May 27, 1954 amendment, Mart agreed to pay Newby $4,500, and in return Newby agreed (1) that the payments under the 1952 agreement, as amended, be reduced to $.60 per 1,000 turret spouts manufactured and to $.41 1/4 per 1,000 in the case of manufacture for Ronson Art Metal Works, Inc. and (2) "that the percentage to be received by him [Newby] under the terms of the option and the percentage interest in the invention and patent rights be reduced to sixteen per cent (16%)." Pursuant to the September 15, 1952 agreement as amended April 9, 1953, Mart executed an assignment on August 6, 1953 to *80 Newby of an undivided 17 percent in the "patent, inventions, improvements, applications, and any letters patent which may be granted therefor or thereupon * * *." It was also specified that the assignment was "made expressly on the condition that as long as HARRY A. MART shall perform all of his obligations in accordance with a certain Agreement dated September 15, 1952 and amended April 9, 1953, * * * the Assignee shall not have the right to practice the inventions or to grant licenses under said patent, applications for patent, patents which may be granted pursuant to said applications, * * * and patents on improvements to said inventions * * *." Some time in 1953 or 1954 the "Newby-Henry Agency Account" was established at the Lake Shore National Bank. The payments due to various parties, including petitioner, under the September 15, 1952 agreement, were paid into this account, and the bank disbursed the proper amounts to the various recipients. During the years 1954 and 1955 the petitioner received payments under the terms of the September 15, 1952 agreement, as amended, in the respective amounts of $1,986.71 and $17,053.44. Petitioner reported the amount received by him in *81 1954 as a long-term capital gain from the sale of "Royalty rights", and he reported the amount received in 1955 as a long-term capital gain from the sale of a "patent". Respondent determined that both of these amounts were taxable as ordinary income. Opinion The sole issue is whether the payments received by petitioner in 1954 and 1955 under the September 15, 1952 agreement, as amended, qualify for capital gains treatment under section 1235 of the Internal Revenue Code of 1954. Section 1235 provides, in part, as follows: SEC. 1235. SALE OR EXCHANGE OF PATENTS. (a) General. - A transfer * * * of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are - (1) payable periodically over a period generally coterminous with the transferee's use of the patent, or (2) contingent on the productivity, use, or disposition of the property transferred. (b) "Holder" Defined. - For purposes of this section, the *82 term "holder" means - (1) any individual whose efforts created such property, or (2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither - (A) the employer of such creator, nor (B) related to such creator (within the meaning of subsection (d)). * * * Petitioner argues that under oral agreement with Mart, he (petitioner) became an owner of an undivided interest in the patent or invention and that his ownership of an interest in the patent continued until he transferred it to Mart by the September 15, 1952 agreement. There is no question but that there was a verbal agreement between Mart and petitioner during the period beginning in 1949 when work was started on the turret-top device, and extending up until the September 1952 agreement. In our view the contractual agreement during said period was an arrangement whereby Mart was to secure the patent and petitioner was to supply financing to the extent of $10,000, and, if the invention proved profitable, he would recover his advancements *83 and receive from Mart a share in future profits from royalties. True, petitioner at various times in his testimony referred to the oral contractual arrangement as a partnership with Mart: we "functioned for quite a period of time as partners", and other witnesses testified Mart and petitioner represented themselves as being business associates and partners in a "deal having to do with the development of a turret spout." But none of the testimony, including the testimony of petitioner, makes it at all clear that he was to have any right, title or interest in the patent. Indeed, it appears to us that the intent was that Mart was to have the patent and petitioner a percent of the profits if the invention proved profitable. It is evident from the conduct of the parties that they used the term "partner" in the sense of a "participant" rather than descriptive of the legal relationship of a partnership entity. Mart made the patent application and secured the patents in his name. In March of 1952 he gave an exclusive license to Turret Seal Corporation. This was all done with petitioner's knowledge for he financed the application and the creation of the corporation. Petitioner had no stock *84 in the corporation in 1952 and the contract of September 1952 recites Mart was the controlling shareholder and president of Turret Seal Corporation. Then, too, the said license and the September 1952 agreement contain. Whereas clauses to the effect that Mart is the owner of all right, title and interest in the invention, patent and applications. Petitioner at no time owned anything more than a right to part of the income from the patent. If he made a transfer of such a right it would not be a transfer of an undivided interest in the patent within the meaning of the statute. See also Sec. 1.1235-2(c), Income Tax Regs.
We see no change in status created by the September 1952 agreement. It obviously is not any transfer of patent rights by petitioner to Mart as petitioner contends. It is really a recognition by petitioner that Mart owned all patent rights and a recognition by Mart that petitioner had some claim as to a portion of the profits or royalty that he, Mart, would receive. The assignment of a 24 percent interest in the patent to petitioner by Mart as security for the latter's performance of the obligations of the contract is utterly inconsistent with *85 petitioner's contention that he had such an undivided interest in the patent before the contract was executed. In order for the payments in question to qualify for capital gains treatment, petitioner had to transfer a patent interest. We hold he failed to establish he ever had or ever conveyed such interest in a patent. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩